## PEOPLE *v.* COLE.

1. INDICTMENT AND INFORMATION—AMENDMENT DURING TRIAL.

It was not reversible error for trial court during course of trial to permit amendment of information in prosecution for obtaining money under false pretenses so that the term "per week" was added to allegation as to net earnings of representatives for the sale of commodity for which complaining witness paid to obtain selling rights in certain territory, where no continuance was sought by the defendant, the information as filed charged an offense, the amendment did not result in charging a different offense and claimed defect was not called to the attention of the court prior to commencement of the trial (CL 1948, §§ 750.218, 767.76).

2. FALSE PRETENSES—PLEADING.

The trial court's denial of defendants' motion to direct verdict because information failed to allege that defendants were officers of a corporation on behalf of which defendants acted in negotiations with the complaining witness was not error in prosecution for obtaining money under false pretenses, where information clearly charged a violation of the statute, setting forth the false pretenses designedly and knowingly made by defendants and alleging that the complaining witness believed and relied thereon and was induced to pay the defendants a stated sum of money (CL 1948, § 750.218).

REFERENCES FOR POINTS IN HEADNOTES

[1] 27 Am Jur, Indictments and Informations § 121.
[2] 22 Am Jur, False Pretenses § 90 *et seq.*
[3] 15 Am Jur, Criminal Law § 365.
[4] 22 Am Jur, False Pretenses §§ 69, 85.
[6] 22 Am Jur, False Pretenses § 86 *et seq.*
[7, 8] 22 Am Jur, False Pretenses § 111.
[9] 22 Am Jur, False Pretenses §§ 21–24.
[10] 14 Am Jur, Criminal Law § 126.
[11] 11 Am Jur, Conspiracy § 26.
[12] 53 Am Jur, Trial §§ 75, 88–90
[13] 53 Am Jur, Trial § 75.
[14] 53 Am Jur, Trial § 74.

3. CRIMINAL LAW—CIVIL LIABILITY.

The fact that the acts and conduct of an individual may result in imposing on him liability for damages does not preclude prosecution for a criminal offense committed in connection with such acts and conduct.

4. FALSE PRETENSES—SETTLEMENT OF CIVIL ACTION.

The settlement of a civil action between complaining witness and defendant in prosecution for obtaining money under false pretenses could be no bar to the criminal prosecution (CL 1948, § 750.218).

5. SAME—CIVIL ACTION FOR DAMAGES.

The trial court's refusal to direct verdict for defendant was proper in prosecution for obtaining money under false pretenses because after the complaining witness had paid over his money to defendant, the latter obtained from the former a relinquishment of any right to recover damages because of any claimed misrepresentation and modified the contract for sale of a commodity in certain territory (CL 1948, § 750.218).

6. SAME—ISSUE INVOLVED.

The issue in a prosecution for obtaining money under false pretenses is whether or not the defendant committed the offense charged and not whether the complaining witness might recover damages in a civil action based on fraud and misrepresentation (CL 1948, § 750.218).

7. SAME—REQUEST TO CHARGE—INSTRUCTIONS—TESTIMONY OF COMPLAINING WITNESS—CORROBORATION.

It was not error to refuse to give request to charge in prosecution for obtaining money under false pretenses that if the jury had a reasonable doubt as to the truth of the testimony of the complaining witness the defendants should be acquitted, where the matter of determining the credibility of the witnesses was covered clearly and fully and defendants' rights were fully protected, the testimony of the complaining witness was corroborated in certain respects by other witnesses and fact that he may have made contradictory statements did not necessarily require that all of his testimony be disregarded or that defendants be acquitted (CL 1948, § 750.218).

8. SAME—REQUEST TO CHARGE—INTEREST OF COMPLAINING WITNESS—WEIGHT OF EVIDENCE.

Request to charge in prosecution for obtaining money under false pretenses that it was not a lawful method for a complaining witness to prefer criminal charges for the purpose of collecting a claimed debt and that if jury found that such was

the purpose of the complaining witness the verdict should be not guilty *held*, improper under the record presented, the interest of the complaining witness in the prosecution being a matter for consideration of the jury in weighing his testimony (CL 1948, § 750.218).

9. SAME—REQUEST TO CHARGE—STATEMENTS OF OPINION—HONEST MISTAKES.

It was not prejudicial error on part of trial judge to fail to give specific requests to charge with reference to statements of opinion and to honest mistakes made without intent to defraud in prosecution for obtaining money under false pretenses, where the matters were fully covered in the general charge given, intent to deceive as an essential element of the crime charged being emphasized and that there be a false representation of a material, existing fact (CL 1948, § 750.-218).

10. INDICTMENT AND INFORMATION—STATEMENT OF CRIME—DOUBLE JEOPARDY.

The accused is entitled to demand and know the nature and cause of the accusation against him, not a detailed recital of the evidence by which it will be established, but a statement of the elements to inform him what he is to meet and prepare for his defense and so identify the particular transaction that the acquittal or conviction will be a bar to a subsequent prosecution of the same offense.

11. FALSE PRETENSES—CONSPIRACY—EVIDENCE.

Evidence presented in prosecution of appellant and his father for obtaining money under false pretenses *held*, sufficient to make an issue of fact for the jury as to appellant's guilt and to support jury's verdict as to him, hence, instruction and explanation as to legal effect of concert of action did not prejudice him, where father was acquitted and people's theory of conspiracy not established (CL 1948, § 750.218).

12. SAME—COLLOQUIES—PREJUDICE—EVIDENCE.

Record in prosecution of father and son for obtaining money under false pretenses *held*, to sustain son's claim that he was prejudiced in the eyes of the jurors by a display of prejudice against him by the trial judge by reason of colloquies between defense counsel and the judge that were somewhat extended and argumentative, the exhibition of an unwarranted partiality toward the prosecution and the vigor of the trial court's examination of the principal defense witnesses (CL 1948, § 750.-218).

13. TRIAL—EXAMINATION OF WITNESSES BY COURT.

    A trial judge may ask questions of witnesses now and then for the purpose of clearing up points that seem obscure, and supplying omissions which the interests of justice demand, but it is not proper for him to conduct an extended examination of any witness, particularly a prisoner on trial for his liberty, it being essential that trials shall be managed fairly.

14. SAME—FAIR TRIAL BY JURY—IMPARTIALITY OF JUDGE.

    A fair and impartial trial by jury demands the maintenance of an atmosphere of impartiality in the courtroom on the part of the trial judge.

DETHMERS, C.J., and SHARPE and CARR, JJ., dissenting.

Appeal from Recorder's Court for the City of Detroit; Schemanske (Frank G.), J. Submitted January 17, 1957. (Docket No. 82, Calendar No. 46,510.) Decided July 31, 1957.

John Cole, Jr., was convicted of obtaining money under false pretenses. Reversed and remanded for new trial.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Gerald K. O'Brien,* Prosecuting Attorney, *Ralph Garber, Samuel Brezner* and *Samuel J. Torina,* Assistant Prosecuting Attorneys, for the people.

*Meyer W. Leib* and *Marvin W. Reider,* for defendant.

    CARR, J. (*dissenting*). Complaint was made in the recorder's court of the city of Detroit against defendant and appellant, John Cole, Jr., his father, John Cole, Sr., and his brother, Robert Cole, for the offense of obtaining money under false pretenses in violation of CL 1948, § 750.218 (Stat Ann § 28.415). Following a preliminary examination the case was dismissed as to Robert, the other defendants being held for trial. The jury acquitted John Cole, Sr.,

and returned a verdict of guilty as to the remaining defendant. Subsequently sentence was imposed for a maximum term of not more than 10 years and a minimum term of not less than 2–1/2 years. A motion for a new trial was made and denied. On leave granted defendant John Cole, Jr., has appealed, claiming that prejudicial and reversible errors occurred during the course of the trial.

The information averred that the defendants named therein, by means of false pretenses and with intent to cheat and defraud, obtained from one John Albert May the sum of $3,000. It was charged specifically that said defendants, representing that they had authority to contract with May for the sale and distribution of Vernor's ginger ale in the State of California, induced May to enter into a contract for certain indicated territory by representing that there were 200 customers therein when in truth and in fact there were but 130; that among said customers were several theaters, which representation was false; that the territory was producing $200 to $300 net per week, whereas the actual amount was less than $100; and that the rights of May in the territory in which he was to operate as described by defendants would be exclusive. It was further averred that May believed said false pretenses and representations, was deceived thereby, and induced to deliver to said named defendants the sum of $3,000.

The information as filed set forth the alleged false representation with reference to the revenue from the sale of Vernor products in the territory assigned to May, but omitted the words "per week." On the trial of the case the complaining witness testified on direct examination, and apparently without objection, that he was told by defendants that drivers in said territory were earning upwards of $200 a week. On re-direct examination the matter was again men-

tioned, and at that time counsel for defendants raised the question that the testimony was not competent because the information in its then form did not specify the period of time to which the alleged statement referred. Attention having been thus called to the omission in the allegation, a motion was made on behalf of the people for leave to amend by inserting the words "per week" so that the charge as set forth would accord with the testimony. The motion was granted, and in response to an inquiry from the trial judge counsel for defendants indicated that he did not wish to ask for an adjournment.

It is claimed on appeal that the trial judge was in error in permitting the amendment to the information. It may not be said, however, that the information in the form in which it was filed failed to charge an offense. Other false representations and pretenses were alleged therein. It may be noted, also, that the claimed defect was not called to the attention of the court prior to commencement of the trial, as contemplated by CL 1948, § 767.76 (Stat Ann 1954 Rev § 28.1016). Counsel for appellant have called attention to cases holding that an amendment to an information is not proper if the effect is to allege another and entirely different crime on which an examination has not been had, and to other decisions indicating that an information charging no offense at all is not subject to amendment. We are not dealing with either situation in the case at bar. The amendment did not result in charging appellant with a different offense than as originally set forth. The examination was held on a complaint charging the offense of obtaining money by false pretenses. The omission of the words "per week" did not render the information void, particularly in view of the other false pretenses alleged. The trial court did not abuse his discretion in allowing the amendment. Ap-

pellant may not complain that he was prejudiced thereby.

It is further contended on behalf of defendants that the trial judge should have directed a verdict of not guilty on the ground that the information failed to allege that the defendants John Cole, Sr., and John Cole, Jr., were officers of a corporation on behalf of which, it is claimed, the defendants acted in the negotiations with May. Reliance is placed on the decision in *People* v. *Brown,* 71 Mich 296, in which respondent was convicted under an information alleging that he had obtained 2 promissory notes by means of false pretenses, which apparently consisted of misrepresentations designedly made as to the financial standing of a certain corporation. However, the information did not allege that the complaining witness had any dealings with the corporation, either directly or by agent, nor was there any allegation as to the consideration for the notes, the payee's name therein, or the matter of negotiability. It was not made to appear that the complaining witness was in any way concerned with the purposes or responsibility of the corporation to which the alleged misrepresentations pertained. It was accordingly held that the information charged no offense, and the conviction was set aside. The facts in the instant case are wholly different than were involved in *People* v. *Brown.* Here the information clearly charged a violation of the statute, setting forth the false pretenses designedly and knowingly made by defendants and alleging, further, that the complaining witness believed and relied thereon and was induced to pay to the defendants named the sum of $3,000. The trial judge was not in error in refusing to direct a verdict on the ground alleged.

It is also argued that the criminal prosecution was improper because of civil aspects of the situation in which the parties concerned were involved. The fact

that the acts and conduct of an individual may result in imposing on him liability for damages does not preclude prosecution for a criminal offense committed in connection with such acts and conduct. See *People* v. *Field*, 290 Mich 173, where it was recognized that:

"Settlement of civil action between employer and complaining witness in prosecution of employee for embezzlement would be no bar to such criminal prosecution (PA 1931, No 328, § 174)." (Syllabus 3.)

On the trial of the case testimony was introduced tending to show that after the complaining witness had parted with his money, and while he was endeavoring to operate in California in the delivery of Vernor's ginger ale, certain modifications were made in the original contract, or at least attempted. On behalf of appellant it is argued that the claimed making of a modification with reference to territory in which May might operate resulted in the latter relinquishing any right to recover damages that he might have because of misrepresentations made to him. Regardless of the effect that the claimed modification might have on a civil action to recover damages, it could not operate to protect appellant from the consequences of criminal conduct on his part. The issue in the case at bar is not whether May might recover against appellant in a suit based on fraud and misrepresentation, but, rather, whether appellant committed the offense with which he was charged. The trial judge was not in error in refusing to direct a verdict on any of the grounds urged by counsel for defendants.

On the trial counsel for defendants submitted to the court certain requests to charge. Among them was a proposed instruction to the effect that the testimony of May, the complaining witness, was conflicting in that he made contradictory statements on

the stand, and that if the jury had a reasonable doubt as to the truth of his testimony the defendants should be acquitted. The request was not given in the form presented, although the matter of determining the credibility of the witnesses was covered clearly and fully. Insofar as defendants were entitled to an instruction to the jury on the subject matter of the request, their rights were protected. It was not error to refuse the request in the form presented. It rested with the jury to determine whether the testimony of the complaining witness was conflicting in material respects, and it was likewise the province of the jury to give such weight and consideration to his testimony as was deemed proper. Contradictory statements, if made, did not necessarily require that all of the testimony of the complaining witness be disregarded or that the defendants be acquitted. The testimony of May was corroborated in certain respects by other witnesses.

The court was also asked to instruct that:

"It is not a lawful method for a complaining witness to prefer criminal charges for the purpose of the collection of a claimed debt and if you find that the purpose of the complaining witness, John Albert May, was not to secure a conviction under the criminal laws of the State of Michigan, but to compel the defendants to pay him the money to which he claimed to be entitled, then your verdict should be not guilty."

The request was apparently predicated on testimony given by May on the preliminary examination to the effect that he sought a return of his money and when repayment was refused made the complaint in the criminal proceeding. On the trial he denied that his purpose was to enforce payment of damages. Our examination of the record brings us to the conclusion that the giving of the request in the form submitted would have been improper. The fact that

recovery of damages might have been had in a civil action by May was patently before the jury, and it may be inferred that due consideration of his possible interest in the case was given in weighing his testimony. The decisions to which counsel for appellant have directed attention are not in point in view of the record in the case at bar.

Complaint is also made because the trial judge did not give defendants' requests to charge with reference to statements of opinion and to honest mistakes made without intent to defraud. Such matters were fully covered in the general charge given, the court emphasizing that intent to deceive was an essential element of the crime charged, and that "there must be a false representation of a fact which is material and something which is present and existing; that is to say, it must be as a material fact, a false representation of something which is material." It must be assumed that the members of the jury understood the statements as to the elements of the offense and realized, in consequence, that a conviction could not be based on mere statements of opinion or on mistakes made honestly without intent to deceive and defraud. We find no error prejudicial to appellant in the failure to give the specific request to charge above indicated.

It is apparent that the case was tried on behalf of the prosecution on the theory that there was concert of action between the defendants. The trial judge instructed the jury that the innocence or guilt of each defendant must be determined separately, but that if the jury found "from the evidence in this case that this defendant, together with another, agreed to commit the crime here charged; that is, if you find from the evidence that they entered into an illegal conspiracy to commit this crime, then each would be liable and answerable to the law not only for his own acts, but he would be answerable to the

law for the acts of the other party who was engaged in the commission of this offense, provided those acts came within the scope of their illegal agreement." Following an illustrative explanation of his meaning, the trial judge stated further:

"So, members of the jury, I charge you as a matter of law that if you find from the evidence in this case beyond a reasonable doubt—and I will define that term to you—that 2 or more or all of these defendants agreed and conspired to commit the crime charged in this information, and if you further find beyond all reasonable doubt that this defendant was present, aiding, assisting and abetting the other in the commission of the particular crime charged in this information, that he was there assisting him to carry out this crime that they had agreed to commit there—if you find all those facts, members of the jury, established by the evidence in this case beyond all reasonable doubt, then the acts of the other within the scope of the illegal agreement would be the acts of this defendant, and the acts of this defendant would be the acts of the other so long as they came within the scope of the illegal agreement. Now, that does not mean, members of the jury, that if someone was committing a crime and somebody was sitting idly by and not doing anything in conjunction with it that the one sitting idly by could be found guilty; but if he did something, if he was present and did acts in furtherance of it, as I have defined that to you, then he would be guilty equally of the offense. Presence alone is not sufficient to constitute the offense unless there is some further activity within the scope of the agreement."

Appellant contends that the reference to conspiracy in the charge was erroneous and prejudicial, and calls attention to the fact that a conspiracy was not charged in the information. It was not required that the people set forth the means or methods by which the defendants committed the alleged offense.

The general rule in this respect was stated in *People*
v. *Quider,* 172 Mich 280, 285, 286, as follows:

"In criminal proceedings the accused is entitled
to demand and know the nature and cause of the
accusation against him. Beyond that, technical ela-
boration of pleadings fails to subserve the ends of
justice, and becomes but ingenious pitfalls for one
side or the other. In charging the offense, a detailed
recital of the evidence by which it will be established
is not required. Such facts must be averred that,
if admitted, would constitute the offense and estab-
lish the guilt of the accused. The elements of the
offense must be so stated that he can know what he
is to meet and prepare for his defense. The particu-
lar transaction must be so identified that his acquittal
or conviction will be a bar to a subsequent prosecu-
tion for the same offense."

Under the information in the instant case the
people were clearly entitled to introduce testimony
tending to establish concert of action between the 2
defendants on trial. Whether there was in fact an
agreement between them amounting to a conspiracy,
so as to render each liable for the acts of the other
in the carrying out of such agreement, was for the
determination of the jury. Since a verdict of not
guilty was returned in favor of defendant John Cole,
Sr., it is a fair inference that the existence of such an
agreement or conspiracy as was involved in the
theory of the prosecution was not found. We do not
think that the trial judge was in error in explaining
to the jury the legal effect of concert of action by
parties carrying out an unlawful agreement to com-
mit a criminal offense, and, in any event, the appel-
lant was not prejudiced thereby in view of the verdict
of acquittal of the codefendant. The evidence in the
case with reference to appellant's conduct, without
reference to that of his associates, was sufficient to
make an issue of fact for the jury as to his guilt, and

the record fully supports the verdict returned. *People* v. *Franz,* 321 Mich 379.

Appellant further complains that the trial judge displayed a prejudiced attitude toward the defense in the case, and that the verdict of the jury may have been affected thereby. The claim is based, in the main, on colloquies between defendants' counsel and the judge, which in certain instances were somewhat extended and argumentative. Not all of such colloquies occurred in the presence of the jury, but some did so occur, and perhaps indicated a measure of irritation on the part of both counsel and judge. The trial consumed approximately 15 days. Counsel for defendants was persistent in stating objections to rulings by the court, and a situation developed analogous in certain respects to that discussed by the Court in *People* v. *O'Hara,* 278 Mich 281, 306. The test to be applied is whether what occurred prevented the appellant here from having a fair and impartial trial. The record does not justify the conclusion that the defendants were prejudiced in the eyes of the jurors by exchanges between counsel or between the court and counsel. The fact that defendant John Cole, Sr., was acquitted indicates that the jurors based their conclusions on the testimony in the case rather than on occurrences having no tendency to establish guilt or innocence on the part of either defendant. The record indicates that the matter of appellant's guilt received fair consideration from the jury, and that the jurors were not influenced or prejudiced by the occurrences of which he now complains.

Other matters referred to by counsel in their briefs and on oral argument do not require consideration. We do not find that any reversible error

occurred on the trial of the appellant, and conviction and sentence should be affirmed.

DETHMERS, C. J., and SHARPE, J., concurred with CARR, J.

EDWARDS, J. My Brother has recited the relevant facts and with his conclusions on the issues presented by the appellant the writer concurs in all respects except the last. Dealing with this issue, Mr. Justice CARR says as follows:

"Appellant further complains that the trial judge displayed a prejudiced attitude toward the defense in the case, and that the verdict of the jury may have been affected thereby. The claim is based, in the main, on colloquies between defendants' counsel and the judge, which in certain instances were somewhat extended and argumentative. Not all of such colloquies occurred in the presence of the jury, but some did so occur, and perhaps indicated a measure of irritation on the part of both counsel and judge. The trial consumed approximately 15 days. Counsel for defendants was persistent in stating objections to rulings by the court, and a situation developed analogous in certain respects to that discussed by the Court in *People* v. *O'Hara,* 278 Mich 281, 306. The test to be applied is whether what occurred prevented the appellant here from having a fair and impartial trial."

After a careful review of this record, the writer is persuaded that the trial judge did exhibit an unwarranted partiality toward the prosecution and that certain aspects of his conduct toward defendant and defendant's witnesses and counsel may well have influenced the jury in its verdict. This record contains 16 printed pages of close and sometimes heated cross-examination by the trial judge of the defendant and the defendant's principal witness. It does not disclose any similar judicial cross-examination of the

prosecution witnesses. A relevant portion of the court's cross-examination of the defendant himself follows:

"*A.* I don't know when the charter was obtained for the corporation from the State of California; you would have to find that out from my brother.

"*The Court:* Wait a minute, Mr. Prosecutor. If he has records, make him produce them. He is a witness on the stand. He can't say ask his brother.

"*A.* I don't have any, sir, on that.

"*The Court:* Well, are they here in court?

"*A.* No, sir, I don't have anything pertaining to that.

"*The Court:* Where are they?

"*A.* They could be in California. * * *

"'The driver in the Arcadia area was a fellow named Blackwood. He serviced this area for a period of 3 to 4 months prior to February of 1952. The party who underwent brain surgery was a man named Denewith. He had a contract signed by the corporation. It was a form contract that we were using at the time. I do not have the contract with me.

"*The Court:* Where is it?

"*A.* It would be in our files in California. If I had known you wanted this—

"*The Court* (interrupting): You knew this case was coming up, didn't you?

"*A.* Yes.

"*The Court:* You knew you were going to take the stand; you conferred with your attorney?

"*A.* Yes, but if I knew they would ask all these questions—

"*The Court* (interrupting): The Court is asking a question.

"*Mr. Leib* [Defendant's attorney]: May I interrupt?

"*The Court:* I am asking a question.

"*Mr. Leib:* No, but I object to the question by the court.

"*The Court:* I am asking the witness a question. Please be seated.

"*Mr. Leib:* Thank you, your Honor.

"*The Court:* You knew you were coming down there to testify, didn't you?

"*A.* Yes, sir.

"*The Court:* Do you have the records here? Can you get the records by tomorrow morning?

"*A.* I don't think we could get them in that soon.

"*The Court:* Where are the records?

"*A.* Well, they are in our office in Long Beach. You would have to get an okay from the fellow that is handling it. He would have to get an okay to take them out, and then they would have to be airmailed back. We do have a record of the accounts of the area. If we had known you had wanted them we would have brought them back.

"*The Court:* The Court wants nothing. The Court is asking these questions and wants to know whether you have them.

"*A.* We do have them."

A similar cross-examination by the trial judge with a bit of a reverse twist took place in relation to the testimony of defendant's brother and principal defense witness:

"*A.* Certain demonstrations were held in May's territory in various markets. I have a list of those markets where the demonstrations were made. The—

"*The Court* (interrupting): Well, where are your records that you made that record from?

"*A.* They are all in the bankrupt referee office in Los Angeles.

"*The Court:* When did you make that particular reference?

"*A.* Back in September.

"*The Court:* Back in September?

"*A.* Yes.

"*The Court:* Back in September? When did you come to Detroit, now?

"*A.* I have been here 3 times in the last 2-1/2 months.

"*The Court:* When was the last time you came here?

"*A.* I was here about a month ago.

"*The Court:* Well, you came here for this trial, did you not, as a witness?

"*A.* That is right.

"*The Court:* Did you bring any records with you?

"*A.* I brought records every time I came.

"*The Court:* What records do you have here now?

"*A.* Everything I have I have turned over to Mr. Leib.

"*The Court:* What are they?

"*A.* Relative to advertising, demonstrations, the contracts, anything that pertains to Mr. Depencier, Mr. May, Mr. Woods, Mr. Secrist or Mr. Miles.

"*The Court:* How is it the receiver doesn't have those particular papers?

"*A.* Well, because, after all, I was informed way back in September, September or October, that this trial was coming up.

"*The Court:* Well, did you withhold these particular records from the receiver?

"*A.* We were not in bankruptcy at that time. We didn't go into bankruptcy—

"*The Court* (interrupting): That isn't what I asked you. You say the receiver has certain records now, is that correct?

"*A.* That is correct.

"*The Court:* And you have certain records now?

"*A.* That is right.

"*The Court:* Did you withhold these records from the receiver in the bankruptcy court?

"*A.* They were withheld before we were in bankruptcy.

"*The Court:* They were withheld before you were in bankruptcy, before you went into bankruptcy? Well, the records were turned over after a receiver was appointed?

"*A.* No, the records were turned over to Mr. Leib before we were in bankruptcy.

"*The Court:* Do you mean the records were turned over to Mr. Leib before you went into bankruptcy?

"*A.* That is right.

"*The Court:* When did you go into bankruptcy?

"*A.* November the 6th, 1953.

"*The Court:* November the 6th, 1953? Well, this warrant was issued October 2d, 1953?

"*A.* Well, in the—October the 2d?

"*The Court:* Yes.

"*A.* Pardon me? Well, we weren't in bankruptcy then. I still had access to all the files.

"*The Court:* Well, you haven't turned over the accounts and all the records pertaining to the situation, have you?

"*A.* These accounts were—

"*The Court* (interrupting): No, wait, just answer my question.

"*A.* Pardon me?

"*The Court:* Have you turned over all of the accounts; I mean the accounts of the area and the entire transactions between Mr. May, Mr. Depencier, and the other people here involved?

"*A.* Have I turned them over to whom?

"*The Court:* To Mr. Leib.

"*A.* Yes.

"*The Court:* He has all the records?

"*A.* Certain records in regard to Mr. May and Depencier.

"*The Court:* All right. The Court will rule on that in the absence of the jury a little later on. Go ahead.

"*Mr. Leib:* Thank you.

"*Q.* (By Mr. Leib, continuing): Now, then, Mr. Cole, do you have an independent recollection of the number of stops or demonstrations that were put on for Mr. May?

"*A.* 16.

"*Q.* 16 stops?

"*The Court:* Wait a minute, now. Did you use these records to refresh your memory before you took the stand?

"*A.* No, I have known this for some time. I have known this for—ever since Mr. May was active in the territory. I know everything that goes on in that business out there. I know practically every account. I made a study of it. I run the business 7 years, almost, myself.

"*The Court:* My question was did you use any of these records to refresh your memory at the present time?

"*A.* No, I know—

"*The Court* (interrupting): You can answer it yes or no. What is difficult about the question? Did you use any of the records to refresh your memory?

"*A.* No.

"*The Court:* All right, go ahead.

"*A.* 16 demonstrations were run in Mr. May's territory.

"*Q.* All right. Now, do you know where those demonstrations were held?

"*A.* Yes, sir.

"*Q.* Where were they held?

"*The Court:* No, don't use any notes to refresh your memory unless you know. If you do the prosecutor is entitled to have the other records.

"*A.* There was the Reece Market, there was 2 Taylor's Markets, there was the El Rancho Market, there was the Box Market, Better Food Market, Ralph's Market, 2 Market Baskets. How many does that make?

"*Q.* Ask the court reporter. For the purpose of refreshing your recollection, Mr. Cole, was a demonstration held at the Gold Stripe Market?

"*A.* Yes, sir.

"*Q.* Was a demonstration held at the Dude Ranch Market?

"*A.* In Pomona, Yes.

"*Q.* Was a demonstration held at the Ewing and Green Market?

"*A.* Yes, sir.

"*Q.* Was a demonstration held at the Moody Market?

"*A.* Yes, sir.

"*Q.* Was a demonstration held at the Wonder Market?

"*A.* Yes, sir.

"*Q.* Was a demonstration held at Ralph's Market?

"*A.* Well—

"*The Court* (interrupting): Well, aren't they leading, Mr. Prosecutor?

"*Mr. Kotelly* [Prosecuting Attorney]: Yes, your Honor.

"*The Court:* I will sustain the objection.

"*The Witness:* Ralph's Market—

"*The Court* (interrupting): Wait a minute. I have ruled on it, Mr. Cole.

"*Mr. Leib:* Merely, your Honor, for the purpose of refreshing the witness' recollection.

"*The Court:* No, there is a proper way of doing it. Let's try the lawsuit.

"*Q.* Well, now, then, Mr. Cole, do you have an independent recollection of the name of these markets without referring to your notes?

"*A.* Yes, sir.

"*Q.* You have an independent—you can testify without your notes?

"*A.* I can testify to most of the markets, yes.

"*Q.* Well, can you testify to all of them without referring to notes?

"*A.* I am not sure I can tell them all, but most of them, 15 or 14 of them.

"*Q.* And is it necessary for you to refer to your notes?

"*A.* No, sir."

The portions of the record cited illustrate the vigor of the trial court in examination of defendant and his principal defense witness. If similar vigor was displayed in cross-examination of the people's witnesses by the judge, this record does not disclose it and since his conduct is placed in issue by defend-

ant's issues on appeal we would presume if similar episodes had appeared during the people's case the prosecution would have seen them included.

In a leading case the supreme court of Tennessee dealt thus with a somewhat similar situation:

"His Honor, instead of permitting the counsel for the State to conduct the cross-examination of the plaintiff in error, in the main took charge of this matter himself. This circumstance alone could not have failed to impress the jury that the trial judge was hostile to the prisoner. In addition to this, the language used in framing the questions was sometimes exceedingly sharp, and at all times closely resembled similar performances on the part of opposing counsel. After 7 pages of the transcript had been thus used the prisoner was turned over to his own counsel, but the latter had brought out material covering only 4 or 5 lines, when his Honor took the witness in hand again, and cross-examined him to the extent of 2 more pages. The prisoner was recalled by the State in rebuttal, and the trial judge again took him in hand and examined him for 2 additional pages. Thus we have 11 pages of the transcript, comprising fully a third of the prisoner's personal testimony taken up with his cross-examination by the presiding judge, and conducted in a manner not at all appropriate to questions propounded by that officer. While it is true that the judge may ask questions now and then for the purpose of clearing up points that seem obscure, and supplying omissions which the interests of justice demand, it is not proper that he conduct an extended examination of any witness, and particularly a prisoner on trial for his liberty or his life. Such a practice, if tolerated by this court, would be far more hurtful to the administration of justice than the escape of many prisoners. It is essential that trials shall be managed fairly, and that trial judges shall not only be just to both sides, but that they shall observe in their demeanor an even tenor, so that an impartial

state of mind may be apparent to all concerned." *Parker* v. *State,* 132 Tenn 327 (178 SW 438, LRA 1916A, 1190).

See, also, *Knapp* v. *Kinsey* (CCA), 232 F2d 458, certiorari denied November 5, 1956, 352 US 892 (77 S Ct 131, 1 L ed 2d 86).

American Jurisprudence says upon the point in question:

"The assumption by the trial judge of the burden of cross-examining the accused in a criminal case with the use of sharp language in framing the questions is reversible error." 3 Am Jur, Appeal and Error, § 1056, pp 606, 607.

We do not intimate that a trial judge may not, in the interest of justice, participate in the questioning of a witness or witnesses. We believe, however, that hostile cross-examination of a defendant in a criminal prosecution is a function of the prosecuting attorney and that a judge before whom a jury case is being tried should avoid any invasion of the prosecutor's role. *People* v. *Egan,* 331 Ill 489 (163 NE 357); *Smith* v. *State,* 12 Okla Crim 513 (159 P 941); Annotation, 84 ALR 1172; Annotation, 57 LRA 875, 882. We believe also that it was error for the judge to decline to entertain defense counsel's objections to his questions and to rule thereon in advance of requiring an answer from the witness. We believe the trial court's strong intimation, in questioning defendant's principal witness, that certain records had been withheld deliberately from the bankruptcy court in California may well have reacted with prejudice on the minds of the jurors. We believe the instances of judicial advice to the prosecuting attorney on the conduct of his case are similarly undesirable, although of and by themselves they certainly would not constitute prejudicial error. 53 Am Jur, Trial, § 74.

Two other colloquies pertaining to defendant's brother and principal defense witness exhibit rather more emotion on the part of the trial judge than the records seem to warrant:

"*Q.* Now, do you have any idea of the number of stops that were in Mr. Depencier's territory?

"*A.* Over 150; pretty close to 200 accounts.

"*The Court:* Well, aren't the records the best evidence if they are here?

"*Mr. Leib:* Your Honor, we don't have those records.

"*The Court:* Well, I don't know what records you have.

"*Mr. Leib:* Well, I will be glad to show them to your Honor.

"*The Court:* No, the Court is not interested except that the procedure is that if a person testifies to something the records are the best evidence.

"*Mr. Leib:* I have no further questions.

"*The Witness:* I wonder if I could say one thing, your Honor?

"*The Court:* No, there is nothing before you. You just be quiet. Wait a minute. Excuse the jury.

(Thereupon the jury was excused from the courtroom.)

(The following proceedings occurred in the absence of the jury):

"*The Court:* One more statement like that from the witness and I will cite him for contempt of court. Bring out the jury.

(Thereupon the jury was recalled to the courtroom.)

"*A.* * * * Approximately $3,000 was spent on Mr. May's account according to the records maintained by our auditor for the corporation. I do not have that ledger sheet with me in court. I am unable to obtain it but my attorney is attempting to get it.

"*Q.* Now, can you get it?

"*A.* Not me, no.

"*Q.* You knew that this case was coming here to-day, didn't you?

"*A.* I didn't know we were going in bankruptcy until this trial put us in bankruptcy. I wasn't expecting—

"*The Court* (interrupting): Now, witness, that is not the question, is it? I might say I have forewarned you before, Mr. Cole. I will excuse the jury.

(Thereupon the jury was excused from the courtroom, and the following proceedings occurred in the absence of the jury):

"*The Court:* Read that statement to me, Mr. Smith.

(The last question and answer were read by the reporter.)

"*The Court:* Did you understand the question?

"*A.* Yes, sir.

"*Q.* How far in school have you gone?

"*A.* Two years of college.

"*The Court:* The question is clear, isn't it, whether or not you have those records, isn't that true?

"*A.* I was trying to explain it.

"*The Court:* Why, your statement now is contemptuous.

"*A.* Your Honor, may I say something?

"*The Court:* No. I will recess for about 5 or 10 minutes. Step down.

"*The Court:* Witness, your remarks, in the opinion of the court, are contempt of the court. The question running in the court's mind at this time is whether the court should find you guilty of contempt of court and sentence you forthwith. If he does that, he will cause a mistrial in the case and, therefore, the case will have to be started *de novo* just as soon as a new jury can be selected. The witnesses in this case have been in the courtroom for a number of days, and the question in the court's mind is whether or not he should sentence you for contempt of court. The only thing that is further running through the court's mind is the hardship it would put these witnesses to who have appeared here so

many days; but I warn you that, if you make any kind of a further statement, whether they have been here or not will make no difference to the court, and the court will take your previous attitude into consideration. You started off on the stand with a chip on your shoulder right from the beginning. The court noticed that attitude, and the court will not mention it again."

The record does not reveal what constituted the contempt. In 1 instance the witness asked the court's permission to volunteer a statement and in the other, on cross-examination, he gave a somewhat indirect and self-serving answer. The record does not disclose any action or tone of voice on the part of the witness which in anywise threatened the orderly conduct of the trial. It would seem that the trial judge could have dealt with these matters with less heat. It is of course true that, standing alone, those comments recited above which were made in the presence of the jury would not ordinarily be considered sufficiently prejudicial to warrant reversal.

The same general observations may be made about several colloquies between the trial judge and defense counsel. Although we agree with Mr. Justice Carr that of and by themselves these colloquies probably did not represent reversible error, they did contain some comments tending to belittle defendant's lawyer in the presence of the jury:

"*Mr. Leib:* Well, perhaps—may I ask your Honor for clarification?

"*The Court:* No, the court is not teaching law at the present time. The court has ruled. Go ahead."

In all of these matters the trial judge has great power and wide discretion. Nor do we intend here to restrict his power to participate properly in the questioning of witnesses, or his control over the conduct of witnesses and of attorneys in his courtroom. 53 Am Jur, Trial, §§ 75, 81, 90.

A fair and impartial trial by jury demands, however, the display of impartiality on the part of the trial judge. This Court has never hesitated to order a new trial in the interest of justice when it thought the wide discretion of the trial judge had been abused so as to prejudice the rights of a litigant. *People v. Neal*, 290 Mich 123; *In re Parkside Housing Project*, 290 Mich 582; *McDuff* v. *Detroit Evening Journal Co.*, 84 Mich 1 (22 Am St Rep 673).

In all of these aspects of the administration of justice we would do well to keep in mind Judge Learned Hand's admonition:

"Justice does not depend upon legal dialectics so much as upon the atmosphere of the courtroom, and that in the end depends primarily upon the judge." *Brown* v. *Walter* (CCA), 62 F2d 798, 800.

Although we feel this record contains evidence from which the jury might properly have concluded that defendant was guilty of the crime charged, there was also considerable evidence to the contrary. On any view of the facts this was a close case. While this has no bearing on the errors we cite in the conduct of the trial judge, it does bear on the question of whether or not such errors were prejudicial. We feel constrained to hold that the errors cited, taken together, may well have created an atmosphere of prejudice which deprived defendant of a fair trial and contributed to his conviction.

We, therefore, hold that the judgment of the court below should be reversed, the sentence vacated, and the case remanded for new trial.

Smith, Voelker, and Black, JJ., concurred with Edwards, J.

Kelly, J., did not sit.