*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMES ANTHONY RODGERS,

Defendant-Appellant.

UNPUBLISHED
September 10, 2019

No. 341976
Wayne Circuit Court
LC No. 17-005679-01-FH

Before: JANSEN, P.J., and CAMERON and TUKEL, JJ.

PER CURIAM.

Defendant, James Anthony Rodgers, appeals his jury trial convictions of felon in possession of a firearm (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b,[1] for which he was sentenced to two years' imprisonment for the felony-firearm conviction, and a concurrent two years' probation for the felon-in-possession conviction. We affirm.

## I. BACKGROUND FACTS

At around 1:00 a.m. on June 11, 2017, Detroit Police Officers Jordan Napier and Brandon Washington were on patrol. As they approached a gas station parking lot, the officers saw an individual who was later identified as Rodgers leaning against a white sedan that was occupied by four people. Rodgers' own vehicle, a Tahoe, was parked about ten to twenty feet away and parallel to the sedan. Officer Napier, who was sitting in the passenger seat of the fully-marked squad car, noticed that Rodgers had an "L shaped bulge" that was visible through his tight-fitting tank top. On the basis of Officer Napier's experience, he believed the bulge to be a firearm, and he instructed Officer Washington to pull the car into the gas station so they could investigate. As the two officers approached Rodgers, Officer Napier saw Rodgers express a "wide eyed" look of

---

[1] Rodgers was also charged with one count of carrying a concealed weapon, MCL 750.227, but was acquitted of this count.

surprise. Rodgers then reached toward his waistband, turned his back to the officers, and proceeded to move from the sedan to the driver-side door of his Tahoe. Officer Napier ordered Rodgers to stop, but Rodgers continued toward his vehicle. The officers pursued Rodgers. As Officer Napier approached Rodgers, he saw Rodgers toss a firearm into the rear of the Tahoe. Officer Washington also observed Rodgers throw a firearm into the rear of the Tahoe. Rodgers was arrested and charged with carrying a concealed weapon, felon-in-possession, and felony-firearm.

At trial, defense witness Henry Rosendary, who is Rodgers' cousin, testified that he was present at the scene on June 11, 2017. On direct and cross-examination, Rosendary made several statements that contradicted the testimony of the prosecution's witnesses. Specifically, Rosendary claimed that the gun found at the scene was his and that it had fallen out of his holster when he was sitting in the back seat of Rodgers' vehicle. Rosendary also disputed the type of clothing worn by Rodgers at the time of his arrest, claimed that Officer Napier walked up to Rodgers and punched him in the face without asking any questions before arresting him, and revealed that he had been living at Rodgers' home. Rosendary also testified that Rodgers had accompanied him to a gun range with the firearm in question sometime before June 11, 2017, and that Rodgers may have touched the gun in question at that time. Following the prosecution's cross-examination of Rosendary, the trial judge then extensively questioned the witness. The trial judge's line of questioning addressed the timeline of when Rosendary moved into Rodgers' home and when he and Rodgers went to the gun range together, revealing discrepancies in Rosendary's testimony. The trial judge also asked a long line of detailed questions regarding the claim that Rodgers was assaulted and battered by Officer Napier.

The jury ultimately convicted Rodgers of felon-in-possession and felony-firearm and acquitted him of the charge of carrying a concealed weapon. Rodgers was sentenced to a term of imprisonment, and this appeal followed.

## II. JUDICIAL BIAS

Rodgers argues on appeal that the trial judge's questioning demonstrated partiality for the prosecution and improperly influenced the jury by creating the appearance of advocacy for the prosecution. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Rodgers did not object to the trial court's questioning of the witness when it occurred or at any time thereafter. Therefore, we apply the plain-error rule, which requires that (1) error must have occurred, (2) the error was plain, i.e., clear or obvious, (3) and the plain error affected substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).[2] An error has

---

[2] Rodgers' brief on appeal incorrectly treats this issue as if it is preserved, offering no plain-error analysis. Rather, he argues that the purported error is structural in nature and that, as such, he is entitled to automatic reversal. The purported error, however, is structural only if it is preserved. See *People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015).

affected a defendant's substantial rights when there is "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. Moreover, "once a defendant satisfies these three requirements, . . . [r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks and citation omitted; alteration in original). A defendant bears the burden of persuasion with respect to prejudice. *Id*.

## B. APPLICABLE LAW AND ANALYSIS

In general "[t]he court may interrogate witnesses, whether called by itself or by a party," MRE 614(b), and is given broad discretion in doing so, *People v Conley*, 270 Mich App 301, 307; 715 NW2d 377 (2006), citing *People v Cole*, 349 Mich 175, 199; 84 NW2d 711 (1957). A defendant must overcome a heavy presumption of judicial impartiality when claiming judicial bias. *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011) (quotation marks and citation omitted). In determining whether a trial judge's conduct deprives a defendant of a fair trial, this Court considers whether the "trial judge's conduct pierces the veil of judicial impartiality." *People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015). "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id.* at 171. This is a fact-specific inquiry, and this Court considers the "cumulative effect" of any errors. *Id.* at 171-172.

In evaluating the totality of the circumstances, this Court must consider a "variety of factors," including the following: (1) the nature of the conduct itself (belittling counsel, inappropriate questioning of witnesses, inappropriate commentary, etc.), (2) "the tone and demeanor the trial judge displayed in front of the jury," (3) the scope of intervention given the length or complexity of the trial, (4) the extent to which the questions were directed at one side over the other, and (5) "the presence or absence of a curative instruction." *Stevens*, 498 Mich at 172-177.[3]

Under the first *Stevens* factor, we conclude that the challenged questioning by the trial judge was appropriate. Our Supreme Court has held that "it is appropriate for a judge to ask questions of a witness that are designed to make clearer otherwise unclear, vague, or confusing testimony." *People v Swilley*, __ Mich __, __ NW2d __ (Docket No. 154684, issued July 17, 2019), slip op at 18, citing *Stevens*, 498 Mich at 173, 175-176. Additionally, this Court has held that a trial judge's questioning of a witness was proper because its questions were meant to "clarify testimony or elicit additional relevant information." *People v McDonald*, 303 Mich App 424, 437; 844 NW2d 168 (2013) (quotation marks and citation omitted). However, a "judge's responsibilities do not include emphasizing or exposing potential weaknesses in a witness's testimony or conveying the judge's personal view on whether a witness should be believed."

---

3 This is not an exhaustive list; rather, these are simply the factors that the *Stevens* Court expressly identified. *Stevens*, 498 Mich at 172.

*Swilley*, slip op at 18. "Questions from a judge that are designed to emphasize or expose incredible, unsubstantiated, or contradictory aspects of a witness's testimony are impermissible." *Id.* at 19. "[I]t is not the role of the court to impeach a witness or undermine a witness's general credibility." *Id.* at 18. Rather, "[c]redibility is properly tested in the crucible of cross-examination, not by judicial inquisition." *Id.* at 21.

Here, although the trial judge's questioning of Rosendary was lengthy, this was warranted by the need to clarify Rosendary's confusing testimony. More specifically, several times in the record, the trial judge, as well as counsel, had difficulty understanding Rosendary's testimony. Further, at times, Rosendary's testimony made little sense and was contradictory. Cf. *Swilley*, slip op at 19 (finding that judicial intervention was not necessary given that the witness's testimony "was clear, simple, and straightforward, providing a consistent time line of events during the afternoon in question"). More specifically, the trial judge questioned Rosendary about his contradictory testimony regarding when he lived with Rodgers, when he bought the gun at issue, and the assault and battery that he testified was perpetrated on Rodgers by Officer Napier:

> *The Court*: Sir, I have some questions for you. You said you've been living with your cousin for about six months.
>
> *The Witness*: Yes.
>
> *The Court*: When did you first move into Mr. Rodgers['] house?
>
> *The Witness*: I can't recall.
>
> *The Court*: You can't recall? It's been a while. But just do your best okay. Today is October the 4th. So, would it have been in the winter time? Summer time? When did you move in?
>
> *The Witness*: Around the beginning of the year.
>
> *The Court*: So, around January. January, February?
>
> *The Witness*: Yes. January. February.
>
> *The Court*: So, you said six months. Would it really have been more like ten months? Because October is the 10th month of the year.
>
> *The Witness*: Yes.
>
> * * *
>
> *The Court*: Okay. I'm confused and I'm not trying to confuse you. But I want you to help me understand your testimony. Okay? If I've gotten something wrong please correct me. Didn't you tell us that you went to the gun range with your cousin with the gun in this case before you moved into his house?

-4-

*The Witness*: Yes.

*The Court*: And didn't you tell us that you moved into his house in January or February?

*The Witness*: Yes.

*The Court*: So, how is it that you bought the gun in May if you already had it to go to a gun range before you moved into his house in January or February.

*The Witness*: I don't know which gun I bought. Like which one. I had more than one.

*The Court*: You have more than one gun?

*The Witness*: Yes.

*The Court*: And how is it that the police officer approaching [sic] your cousin from that car at the intersection?

*The Witness*: He was running towards him.

*The Court*: So, your cousin is just minding his own business in the gas station, right?

*The Witness*: Yes.

*The Court*: So, from what you can see not doing anything bad, not doing anything wrong, right?

*The Witness*: Yes.

*The Court*: And an officer from far away hops out a car and runs up on him.

*The Witness*: Yes.

*The Court*: And just fires on him?

*The Witness*: Yes.

*The Court*: Hit him where?

*The Witness*: In the mouth.

*The Court*: He hit him right in the mouth.

*The Witness*: Yes.

*The Court*: And what did your cousin do when he got hit on the mouth unprovoked by this police officer who ran up from an intersection[?]

*The Witness*: He didn't do anything. He slammed him on the car and handcuffed him.

*The Court*: Okay. So, the officer, the white officer you said—

*The Witness*: Yes.

*The Court*: Hit him in the mouth. Slams him on what?

*The Witness*: The car.

*The Court*: Which car?

*The Witness*: The white one.

*The Court*: Slams him on the white car and handcuffs him?

*The Witness*: Yes.

\* \* \*

*The Court*: And then do you ever see [Officer Washington]—when you say he's looking around the vehicle what does he do?

*The Witness*: I didn't see him then because the other officer was yelling at everybody. He said walk away.

*The Court*: Do you have a cell phone?

*The Witness*: Yes.

*The Court*: Did you whip out your cell phone?

*The Witness*: Yes.

*The Court*: Did you whip out your cell phone and start recording these police who were beating up your cousin and harassing him?

*The Witness*: No, I didn't.

*The Court*: Why not?

*The Witness*: I wasn't thinking of that. I was trying to talk to the officer but he was telling me I had the license.

-6-

Further, in response to Rosendary's testimony that, even though he owned the firearm, he was unable to recover it from law enforcement because he lacked the proper "documentation," the trial court asked Rosendary the following questions:

> *The Court*: And I think someone asked you if you tried to get your gun back and you said that you could not get your gun back because you didn't have the paperwork?
>
> *The Witness*: Yes.
>
> *The Court*: What kind of paperwork was it that you needed to get your gun back?
>
> *The Witness*: Paperwork—(inaudible).
>
> *The Court*: And do you have that?
>
> *The Witness*: No. I lost it.
>
> *The Court*: And what about your concealed pistol license? Do you have that?
>
> *The Witness*: Not today.
>
> *The Court*: You didn't bring that with you today?
>
> *The Witness*: No, I didn't. It's currently suspended now.

After reviewing the record, we conclude that the trial court's examination of Rosendary was not error because the questions posed did not give the appearance of partiality and served to clarify the record evidence rather than add to, or distort the evidence. See *People v Davis*, 216 Mich App 47, 50-52; 549 NW2d 1 (1996). Although the trial court seemed to be challenging Rosendary's testimony at times, there is no indication that the trial judge sought to impeach Rosendary or undermine his general credibility. Rather, the trial court asked the questions in order to elicit additional relevant information and to clarify Rosendary's testimony. See *Stevens*, 498 Mich at 173 ("[I]t is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information."); *Swilley*, slip op at 18, citing *People v Young*, 364 Mich 554, 558; 111 NW2d 870 (1961) (noting that a judge's authority "encompasses a right to question a witness for the purpose of shedding light on something unclear in the testimony"). Importantly, the record reveals that Rosendary was not an "easy witness" and counsel had not clarified the inconsistencies in Rosendary's testimony before the trial judge's interjection. See *Swilley*, slip op at 26 ("Judicial questioning might be more necessary when confronted with a difficult witness who refuses to answer questions or provides unclear answers."). Because the now challenged questioning on the part of the trial court was proper, this factor weighs against the presence of bias.

The second *Stevens* factor considers the tone and demeanor displayed by the trial judge in front of the jury. Although appellate courts cannot read tone from the record, certain words may

be considered hostile or biased by their very nature, when considered in the context in which they are used. *Id*. at 174-176. Furthermore, judges should avoid questions that are argumentative, skeptical, intimidating, or otherwise hostile, especially if the witness is undeserving of heated inquiry. *Id*. at 175.

Here, as far as can be construed from the transcript, the trial judge did not speak to Rosendary with a tone that would suggest hostility. Although the trial judge's questioning at certain points did exhibit some signs of skepticism, the now challenged exchange is distinguishable from other cases where the tone and demeanor of the trial judge's questions were found to show bias. In *Cole*, 349 Mich at 197-198, the trial judge made comments to the principal defense witness such as "there is nothing before you, [y]ou just be quiet," and "[n]ow witness, that is not the question, is it?" Such statements, on their face, show hostility and belittling of the witness. The comments made here by the trial judge do not show an obviously sarcastic tone and are more aptly interpreted as being said in a frank, genuinely inquisitive manner. This case also can be distinguished from *Stevens*, 498 Mich at 186-187, where the trial judge asked plainly sarcastic questions and used words such as "allegedly" to describe the witness's testimony; no such questions were present in the trial judge's exchange with Rosendary. Further, unlike the trial judge in *Swilley*, the trial judge herein did not "pepper[]" Rosendary with questions in a "combative manner" without even giving him a chance to respond. *Swilley*, slip op at 29. Indeed, some statements made by the trial judge in this case appear to be deferential to the witness. Specifically, at one point, the trial judge stated "[i]t's been a while[,] [b]ut just do your best okay," and "I'm confused and I'm not trying to confuse you[,] [b]ut I want you to help me understand your testimony . . . [i]f I've gotten something wrong please correct me." Further, at no point did Rosendary complain about the questions being posed by the trial court. Cf. *id.* at 29 (noting that, during the trial court's questioning, the witness hesitated and stated "[w]ait a minute, you trying to confuse me"). Considering the lack of evidence of an improper tone or demeanor, this factor weighs against the presence of bias.

The third factor in *Stevens*, 498 Mich at 187, considers the scope of intervention given the length or complexity of the trial, as well as the complexity of the issues therein. Questioning of a witness may be deemed inappropriate when it is excessively long, in light of the complexity of the trial. *Cole*, 349 Mich at 188. In *Cole*, the trial judge questioned the defendant and a defense witness for a total of 16 pages of the transcript, in a 15-day trial. *Id*. The trial judge subjected the witness to a series of heated questions and frequently interrupted the witness. *Id*. at 188-194. The trial judge did not question the prosecution's witnesses with similar vigor. *Id*. at 194-195. Consequently, our Supreme Court held that the length of the questioning, as well as the tone and the unequal rigor of questioning between the defense and prosecution's witnesses, demonstrated partiality; the Court reasoned that all of these errors taken together created an atmosphere of partiality toward the prosecution. *Id*. at 200. Similarly, in *Simpson v Burton*, 328 Mich 557, 563-564; 44 NW2d 178 (1950), our Supreme Court held that because the questions asked of the defendant were "very many in number," they may have unjustifiably made the jury suspicious of the defendant, and thus were partial to the plaintiff.

Here, given the brevity of the trial and the lack of complexity of the subject matter to which Rosendary was testifying, the trial judge's line of questioning directed at Rosendary was lengthy; however, this factor is mitigated by the reasonable effort to clarify his testimony and elicit additional evidence. Further, the trial judge's questions were not asked until after counsel

had finished examining Rosendary, and counsel was given the opportunity to ask additional questions after the trial judge's questioning. Rodgers' trial lasted one day, resulting in 190 pages of transcript, and the trial judge's questioning of Rosendary comprises 12 pages of transcript. Relative to other cases, this line of questioning is extensive. See e.g., *Cole*, 349 Mich at 188 (finding that a 16-page examination by the trial court in a 15 day trial was excessive). However, we find that the trial judge's extensive questioning was not improper for the reasons already discussed and therefore does not indicate any bias by the trial court.

Under the fourth factor, which considers the extent to which the trial judge's questions were directed at one side more than the other, *Stevens*, 498 Mich at 188-189, the trial judge's questioning of Rosendary was longer and more vigorous than the questioning of the prosecution's witnesses. While the trial judge questioned Rosendary for 12 pages of transcript, the court only questioned the prosecution's witnesses for a total of five pages of transcript. Although there is an imbalance in the volume of the trial judge's questioning of Rosendary, as already stated, the questions asked appeared to be to clarify his testimony and to elicit additional, relevant information. Rodgers contends that the trial judge's questioning of Detective Lewis, in addition to being more limited than the questioning of Rosendary, was also aimed at impeaching Rosendary before Rosendary testified. While it may be true that the line of questioning with respect to Detective Lewis called Rosendary's credibility into question, defense counsel had raised the issues of Officer Napier's use of force and Rodgers' clothing during Officer Napier's cross-examination, and these issues were not explained in much detail. The trial judge's questions for Detective Lewis about use-of-force reports helped to explain what steps the police would have taken if there had been physical force used on June 11, 2017. The questions about Rodgers' arrest photograph also helped to clarify why Officer Napier may have seen Rodgers in different clothing than what is shown in his booking photograph. Although the inequality of questioning would normally weigh toward there being a display of bias in front of the jury, because the inequality exists for the purposes of clarifying testimony, we find that it does not show bias.

Lastly, under the fifth *Stevens* factor, we must consider the presence of any curative instructions. *Stevens*, 498 Mich at 190. Curative instructions weigh against the presence of partiality toward one party, but are not dispositive. *Id.* at 190. For example, in *Stevens*, the trial judge informed the jury that its comments and questions comprised neither evidence nor personal opinion. *Id.* Our Supreme Court held that such general curative instructions did not alleviate a trial judge's bias because the bias present in that case was particularly substantial and excessive. *Id.* at 191. See also *Swilley*, slip op at 36 ("Even the judge's instructions during witness testimony could not right the ship given the extent and inappropriate nature of the questioning."). Additionally, the *Stevens* Court held that a curative instruction that immediately follows inappropriate conduct is especially helpful in alleviating the appearance of judicial bias. *Stevens*, 498 Mich at 177.

Here, at the beginning of trial, the trial judge issued a standard preliminary instruction with respect to its potential questioning of witnesses: "I may ask some of the witnesses questions myself. These questions are not meant to reflect my opinion about the evidence. If I ask questions, my only reason would be to ask about things that may not have been fully explored."

After closing arguments, the trial judge provided a curative instruction that its comments and questions were not evidence. In the final jury instructions, the trial judge issued the following standard instruction:

Many things are not evidence. And you must be careful not to consider them as such. I will now describe some of the things that are not evidence. . . . The lawyers['] questions to the witnesses, your questions to the witnesses, and my questions to the witnesses are . . . not evidence. You should consider these questions only as they give meaning to the witnesses['] answers. My comments, ruling[s], questions and instructions are also not evidence. It is my duty to see that the trial is conducted according to the law and to tell you the law that applies to this case. However, when I make a comment or give an instruction or ask a question, I'm not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case[,] [y]ou must pay no attention to that opinion. You're the only judge of the facts and you should decide this case from the evidence.

We must assume that the jurors followed the instruction given by the trial judge that its questions did not reflect its opinion about the evidence. See *Stevens*, 498 Mich at 177. Although the instruction may have been more effective had it been given closer to Rosendary's testimony or if the instruction included an explicit reference to that line of questioning, we conclude that the instruction was sufficient to protect Rodgers' substantial rights, especially when considering that it was given before and after Rosendary's testimony.

In sum, the totality of the circumstances does not demonstrate a reasonable likelihood that the trial judge's conduct during trial improperly influenced the jury by creating the appearance of advocacy or partiality against Rodgers. See *id.* at 164. Thus, Rodgers has failed to demonstrate plain error on this ground, and he is not entitled to a new trial. See *Carines*, 460 Mich at 763.

Affirmed.

/s/ Kathleen Jansen
/s/ Thomas C. Cameron
/s/ Jonathan Tukel