# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JUSTIN EARL BOWLES,

Defendant-Appellant.

UNPUBLISHED
December 20, 2018

No. 339186
Eaton Circuit Court
LC No. 16-020072-FC

Before: SWARTZLE, P.J., and SAWYER and RONAYNE KRAUSE, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of one count of first-degree criminal sexual conduct (CSC-I) under MCL 750.520b(1)(a); MCL 750.520b(2)(b) (sexual penetration of a victim less than 13 years of age by a defendant 17 years of age or older), one count of CSC-I under MCL 750.520b(1)(b)(*i*) (sexual penetration of a victim at least 13 but less than 16 years of age and a member of the same household), three counts of second-degree criminal sexual conduct (CSC-II) under MCL 750.520c(1)(a); MCL 750.520c(2)(b) (sexual contact with a victim less than 13 years of age by a defendant 17 years of age or older), and one count of CSC-II under MCL 750.520c(1)(b)(*i*) (sexual contact with a victim at least 13 years of age but younger than 16 years old and a member of the same household). Defendant was sentenced as a second-offense habitual offender, MCL 769.10, to serve 40 to 60 years in prison for each CSC-I conviction and to serve 14 years to 270 months in prison for each CSC-II conviction. Defendant appeals as of right. We affirm.

## I. PERTINENT FACTS

The evidence presented at trial against defendant consisted of the testimony of the four victims, their mother, and one investigating police officer. Defendant did not present any evidence. The testimony established that over the course of several years, defendant engaged in a pattern of sexual abuse against the victims beginning in 2010, and continuing until 2014.

When defendant was engaged in his pattern of sexual abuse, he would often wait until the victims were sleeping during the nighttime hours, sneak into their bedroom, and target one of them. The victims recalled several instances in which they were woken up in the middle of the night, finding defendant in bed with them or close to them, with his hand down their pants; defendant would also penetrate the victims' genitals with his fingers. Several of the instances of abuse occurred while the victims' mother was apparently sleeping or passed out on prescribed

-1-

sleep medication. The victims apprised their mother of defendant's actions, but the abuse continued. In October 2015, local police received reports of the allegations against defendant after one of the victims informed a Child Protective Services agent about them.

## II. APPEARANCE OF WITNESS

Defendant first claims that the appearance at trial of the victims' mother—who, defendant asserts, testified while shackled and wearing prison attire—was so prejudicial that it deprived him of a fair trial. We disagree.

This Court "will review a trial court's decision to handcuff or shackle a witness for an abuse of discretion." *People v Banks*, 249 Mich App 247, 257; 642 NW2d 351 (2002). "At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "When the trial court selects one of these principled outcomes, the trial court has not abused its discretion . . . . An abuse of discretion occurs, however, when the trial court chooses an outcome falling outside this principled range of outcomes." *Id*. Any error in handcuffing a witness is nonconstitutional in nature. *Banks*, 249 Mich App at 258-259. "[A] preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *Id*. at 259-260 (quotation marks and citations omitted; alteration in original).

"The authority and discretion afforded to trial courts to control the course of trial is, in fact, very broad." *People v Johnson*, 315 Mich App 163, 177; 889 NW2d 513 (2016). Trial judges have " 'wide discretion and power in matters of trial conduct,' " *People v Conley*, 270 Mich App 301, 307; 715 NW2d 377 (2006), quoting *People v Cole*, 349 Mich 175, 199; 84 NW2d 711 (1957), including "the authority to control the mode and order by which witnesses are interrogated," *People v Rose*, 289 Mich App 499, 509; 808 NW2d 301 (2010), citing MRE 611(a). See also MRE 611(b).

A defendant's right to a fair trial includes the right to appear before a jury without wearing any indicia of incarceration, including physical restraints or prison attire. See *People v Payne*, 285 Mich App 181, 186; 774 NW2d 714 (2009), and *People v Lee*, 133 Mich App 299, 300-301; 349 NW2d 164 (1984). In *Banks*, this Court for the first time addressed the trial court's authority to handcuff or shackle a witness other than a defendant. This Court held that the handcuffing of a testifying witness is subject to the same analysis as that for defendants—it "should be permitted only to prevent the escape of the witness, to prevent the witness from injuring others in the courtroom, or to maintain an orderly trial." *Banks*, 249 Mich App at 257. This Court has not addressed whether a trial court, upon a timely request, must also allow an incarcerated witness to wear civilian clothing. Compare *People v Harris*, 201 Mich App 147, 151-152; 505 NW2d 889 (1993) (a defendant's timely request to wear civilian clothing must be granted).

On the second day of trial, before the victims' mother was brought to the courtroom to testify as a witness for the prosecution, the prosecution noted that she was lodged with the Michigan Department of Corrections (MDOC) and would be with a guard. Defendant's trial

attorney objected on the record "to her being presented to the jury in prison uniform. And if I know MDOC, too, she'll be shackled with a guard at her side." Following a lengthy discussion, the trial court remarked that it did not have "any control" over the MDOC. When the matter resumed on the record, the trial court suggested that it would be best to bring the witness to the stand before the jury entered the courtroom. It is apparent from the transcript that the witness entered the courtroom escorted by an unidentified female guard, who was offered a chair near the witness stand. The witness was sworn and seated, and then the jury entered the courtroom.

Because the record is devoid of any description of the witness's *actual* appearance in front of the jury, this Court cannot conclude that defendant was deprived of a fair trial. See *People v Dunn*, 446 Mich 409, 425; 521 NW2d 255 (1994) ("The record does not show, however, that any member of the jury saw or could see the leg irons, and, therefore, the record does not provide a basis for a finding that the use of leg irons deprived [the defendant] of a fair trial."). Moreover, *Banks* is distinguishable because this case does not involve a defense witness whose credibility was crucial to defendant's defense, but rather a witness testifying for the prosecution. Had the witness testified *for* defendant as an alibi witness or as a character witness, defendant's contention on appeal would be more logically acceptable because one might conclude that her credibility was damaged, considering her appearance as a guilty or dangerous person. Instead, any negative inference drawn by the jury from her appearance likely favored defendant.

Assuming that the witness was wearing prison clothing (which the prosecution does not dispute on appeal), we conclude that the trial court's decision to permit her to testify while wearing prison clothing was within the range of reasonable and principled outcomes, *Babcock*, 469 Mich at 269, considering the lack of binding authority that would have imposed a duty on the trial court to either forbid the testimony under the circumstances or allow her to change into street clothing before testifying. Accordingly, the trial court's decision to permit the witness to testify while wearing prison clothing ostensibly falls within its broad authority to control the course of trial. *Johnson*, 315 Mich App at 177; MRE 611.

### III. PROSECUTORIAL MISCONDUCT

Next, defendant alleges three instances of prosecutorial misconduct, asserting that (1) the prosecutor improperly used the term "red herring" in characterizing defendant's trial counsel's arguments; (2) the prosecutor vouched for witness credibility; and (3) the prosecutor denigrated the defense. We disagree.

"Claims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). Prosecutors are generally accorded great latitude regarding their arguments and conduct. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Accordingly, they may argue the evidence and all reasonable inferences as it relates to their theory of the case. *Id*.

Prosecutorial misconduct issues are decided on a case-by-case basis by examining the pertinent portion of the record and evaluating the prosecutor's conduct in context. *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002). The propriety of the prosecutor's remarks depends on all the facts of the case. *Id*. at 30. The disputed comments must be read as a

whole and evaluated in the light of defense arguments and the relationship they bear to the evidence admitted at trial. *Id.* The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *Id.* at 29.

A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the guilt or innocence of the accused. *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007). However, otherwise improper prosecutorial remarks may not necessitate reversal if they address issues raised by defense counsel, i.e., where the remarks are invited responses. *United States v Young*, 470 US 1, 11-13; 105 S Ct 1038; 84 L Ed 2d 1 (1985); see *People v Jones*, 468 Mich 345, 353; 662 NW2d 376 (2003). The invited response doctrine does not excuse improper prosecutorial remarks, but guides the determination whether the disputed conduct requires reversal based on its effect on the trial as a whole. *Jones*, 468 Mich at 353. Plain error will not be found where, reviewing the comments in context, they are merely responsive to a defense argument, and any prejudicial effect could have been cured by a limiting instruction. *Rodriguez*, 251 Mich App at 32.

## A. "RED HERRING" REMARKS

During the prosecution's closing argument, the prosecutor stated the following in response to defendant's trial attorney's cross-examination of Charlotte Police Detective James Beal:

> So, we've heard . . . in the last question that was asked of Detective Beal, about this evidence, proof, testimony distinction. And I'm tellin' you this is the defendant's red herring. Here's why:
>
> Evidence is the available body of facts or information indicating whether a belief or proposition is true or valid, and the synonyms are: Proof, evidence. Synonyms: Proof, confirmation, verification, substantiation, corroboration.

Following the conclusion of all closing arguments, outside the presence of the jury, the trial court clarified that the prosecutor's closing argument also featured a PowerPoint presentation. One of the PowerPoint slides, titled "Evidence/Proofs/Testimony," stated in capitalized bold red text: "DEFENSE RED HERRING."

It is clear from the prosecutor's remarks that the "red herring" she was referring to pertained to defense counsel's repeated focus on "this evidence, proof, testimony distinction." For example, defense counsel stated during his opening statement:

> There's only two possibilities. Either everything that these girls are going to tell you is true, and if you believe it to be the truth you're supposed to convict him. On the other hand, if you have doubts about whether you believe them, then your verdict goes the other way. Kay?
>
> I don't anticipate there's gonna be any physical evidence in this case. There's not gonna be a doctor coming up here and telling you that, you know, he or she gave medical examinations to any of these girls. That's not gonna happen.

There's not gonna be any photographs. There's nothing. Kay? The girls are gonna come up and they're gonna tell you stories. . . .

During defense counsel's cross-examination of Beal, he asked whether Beal discovered any photos of the victims in defendant's possession, and after Beal indicated that he had not, counsel inquired into whether Beal had generally discovered child pornography in the possession of an accused perpetrator in the course of Beal's other sex-crimes investigations. When Beal referenced a different matter in which he discovered child pornography in a case with similar facts—i.e., when the perpetrator assaulted the victims in their sleep—defense counsel asked Beal whether the child pornography was considered evidence supporting the allegations that the assault actually occurred, to which Beal responded affirmatively.

During the prosecutor's redirect-examination of Beal, she asked whether Beal considered a victim's statement evidence, to which Beal responded affirmatively. Immediately following, during defense counsel's recross-examination of Beal, he asked, "Are victims' statements proof? Yes or no," to which Beal responded, "Depends on the interpretation," and counsel stated, "I'll take that as a no."

Viewing the context of the prosecutor's "red herring" remarks, it appears that she was not commenting on any substantial theory of defense—especially considering that defendant did not present any witnesses. Rather, the prosecutor's remarks appear to have been directed toward defense counsel's focus and attempt to define what constitutes evidence in a case that is dependent entirely on testimony—and mostly victim testimony, i.e., what defense counsel called "stories." The "red herring" remarks were therefore responsive to defense counsel's "evidence, proof, testimony distinction," and they did not interject issues beyond defendant's guilt or innocence. *Dobek*, 274 Mich App at 63-64. Accordingly, considering the context and defendant's trial counsel's conduct throughout the trial, the prosecutor's use of the term "red herring" did not amount to prosecutorial misconduct. Finally, the trial court instructed the jury that "the lawyers' opening statements and closing statements, including the prosecutor's Power Point that was placed in the courtroom for her closing argument, are not evidence." The jury presumably followed the trial court's instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

## B. VOUCHING FOR WITNESS CREDIBILITY

Defendant further avers that, had the "red herring" remarks constituted the sole prosecutorial impropriety, "it might be something that could be overlooked." According to defendant, however, "[i]n order to increase the chances for a conviction on a weak case, the prosecution improperly vouched for the credibility of witnesses, had witnesses vouch for the credibility of other witnesses, and had witnesses even vouch for their own credibility."

"A prosecutor may not vouch for the credibility of a witness, nor suggest that the government has some special knowledge that the witness is testifying truthfully." *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997). "A prosecutor may, however, argue from the facts that a witness is credible or that the defendant or another witness is not worthy of belief," *id*., and the prosecutor is "not required to state inferences and conclusions in the blandest possible terms," *People v Launsburry*, 217 Mich App 358, 361; 551 NW2d 460 (1996).

Specifically, defendant first refers to the prosecution "cloaking" the victims' mother with credibility by asking her whether she had been promised anything in exchange for her testimony, and asking her whether she was telling the truth to the best of her ability. There was nothing improper about the question. The prosecutor did not convey a message to the jury that she had any special knowledge or facts indicating the witness's truthfulness, *Bahoda*, 448 Mich at 277, because the questioning simply sought an affirmation of truthfulness; it did not elicit any detailed information that would otherwise suggest that the prosecutor had special knowledge of the facts the witness testified about. Moreover, the trial court instructed the jury to judge witness credibility in consideration of whether any "promises, threats, suggestions, or other influences" affected how the witness testified. The prosecutor's statements were therefore relevant to what the jury would subsequently be instructed to consider when assessing credibility and weighing evidence.

Next, defendant appears to assert that the following question to one of the victims amounted to prosecutorial misconduct: "Are you saying these—are you telling us today about what the defendant did to you because it really happened?" In asking this question, the prosecutor neither vouched for the witness's credibility nor suggested that she had any special knowledge concerning the truthfulness of the testimony. *Howard*, 226 Mich App at 548. The context of the trial also supports the conclusion that this statement did not amount to prosecutorial misconduct, because the prosecution's case-in-chief was largely dependent on the victims' testimony and no other evidence. Accordingly, the result of defendant's trial rested almost entirely on whether the jury believed that the victims were telling the truth, and their motive for testifying was an appropriate point of questioning for the prosecutor to consider. See *People v Minor*, 213 Mich App 682, 685; 541 NW2d 576 (1995) ("A witness' motivation for testifying is always of undeniable relevance and a defendant is entitled to have the jury consider any fact that may have influenced the witness' testimony.").

Further, defendant cites the following statements during the prosecutor's closing argument: "I think that we're gonna hear some theories about this—this whole thing being made up . . . . But, this isn't something you make up," and "[w]hat does make sense is that they came in here, and they told you the truth about what the defendant was doing to them . . . ." With respect to the first statement, the prosecutor did not expressly vouch for the victims' credibility. Rather, she offered the general proposition to the jury that the girls' allegations were not in the nature of sheer imagination.

After stating, "This isn't something you make up," the prosecutor went on to discuss the details of one of the victims' accounts to support her general theory that the victims' stories were too detailed to be fiction. Again, the entirety of the prosecutor's case-in-chief was based on testimonial evidence—a majority of it from the victims—and, considering the prosecutor's statements in context, *Rodriguez*, 251 Mich App at 30, she neither expressly vouched for the victims' credibility nor suggested that she had any special knowledge concerning the truthfulness of their testimony, *Howard*, 226 Mich App at 548.

When the prosecutor stated, "[T]hey told you the truth about what the defendant was doing to them, year after year," the prosecutor, in essence, summarily suggested—based on the facts—that the victims were credible, *Howard*, 226 Mich App at 548, because their testimony was consistent with each other's. A reasonable inference that could be drawn from the consistent

-6-

testimony of each victim, without any evidence to the contrary, would be that they were testifying truthfully. The prosecutor was "not required to state inferences and conclusions in the blandest possible terms," *Launsburry*, 217 Mich App at 361, and she did not suggest that she had any special knowledge concerning the truthfulness of the victims' testimony, *Howard*, 226 Mich App at 548.

The final alleged instance of improper credibility vouching occurred during the prosecutor's rebuttal:

> This isn't just about them coming in and saying something. I mean, they did that. But, again, Mr. Freeman read from the instruction about credibility, about how to judge credibility. And I go back to the discussion about expectations. But, what was the witness's demeanor when they were testifying? That's something that you can look at. The pure, raw emotion, which . . . was a little bit overwhelming, just the raw emotion from all of them.

Although defendant challenges the aforementioned prosecutorial statements, he does not challenge the trial court's jury instructions, which pertinently stated:

> In deciding the testimony you believe, you should rely on your own *common sense and everyday experience*.
>
> * * *
>
> There are no fixed rules for judging whether you believe a witness, but it may be helpful to think about these questions:
>
> * * *
>
> How did the witness *look and act* while testifying? Did the . . . witness seems to be making an honest effort to tell the truth, or did the witness seem to evade the questions and argue with the lawyers? [Emphasis supplied.]

The prosecutor's statements were consistent with the subsequent jury instructions about judging witness credibility; she did not tell the jury to do anything that it was otherwise forbidden from doing when weighing evidence and assessing credibility, e.g., accounting for witness demeanor, or, as the prosecutor stated, "pure, raw, emotion." Accordingly, considering the prosecutor's comments in context, *Rodriguez*, 251 Mich App at 30, they did not amount to prosecutorial misconduct.

## C. DENIGRATION OF DEFENSE

Defendant asserts that the prosecution "denigrated the defense." Specifically, defendant cites the following prosecutorial statements as examples:

> Mom said she thinks only [one of her daughters] told her. But, again, you're gonna be told to—you can use your common sense. That doesn't make

sense, because they were all part of the decision-making process. Why? Why would they all be part of that process if only one of them disclosed anything?

* * *

So, what are the defense theories that have kind of been developed through testimony and in opening statements? [One victim's] lying to get her way. Well, [she] was already . . . out when she reported. She reported before getting her way. And we know [her] not wanting to go back to that house makes complete and total sense. So, that argument doesn't make any sense.

* * *

[One of the victims] made this up and told her sisters what to say. Well, the problem is there's just no evidence of that, because your decision has to be based on evidence. And she has no motive to do this. She's already out of the house. So, I mean . . . first of all, she is the one who comes up with the idea to let him stay at the family meeting, so that can't be the motive at that meeting, getting him out. And if we're talking about a motive in October of 2015 to get him out, she's already out of the house. So, again, that doesn't make any sense.

Considering all of defendant's examples of "denigration" of the defense, although he claims the statements amounted to prosecutorial misconduct, they are merely illustrative of the prosecution arguing the evidence and all reasonable inferences from that evidence as it related to its theory of the case. *Bahoda*, 448 Mich at 282. To conclude otherwise would constitute an open endorsement of the notion that prosecutors are forbidden from arguing how the evidence admitted conforms to their theories of guilt. Again, the prosecutor was not required to state these reasonable inferences "in the blandest possible terms." *Launsburry*, 217 Mich App at 361. The mere fact that these inferences cast guilt upon defendant does not equate to prosecutorial misconduct.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant claims that he received ineffective assistance of counsel by his trial attorney's (1) failure to move for a mistrial in regard to the prosecutor's "red herring" remarks; (2) failure to call character witnesses; and (3) failure to impeach the victims with reports from Child Protective Services (CPS) and police reports. We disagree.

Defendant failed to preserve this claim by either raising the issue in a timely filed motion for a new trial, *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000), or moving for a *Ginther*[1] hearing at the trial court level, *People v Hurst*, 205 Mich App 634, 641; 517 NW2d 858 (1994). Therefore, this Court's "review is limited to errors apparent on the record." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

To establish ineffective assistance of counsel, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," in addition to establishing "that the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "[D]efendant must overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances." *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

With respect to prejudice, the defendant must establish that counsel's deficiency "was so prejudicial to him that he was denied a fair trial." *Toma*, 462 Mich at 302. Accordingly, the defendant must establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 302-303. Further, counsel is not required to argue frivolous or meritless motions, and the failure to do so does not amount to ineffective assistance of counsel. *People v Gist*, 188 Mich App 610, 613; 470 NW2d 475 (1991).

## A. FAILURE TO REQUEST A MISTRIAL

Defendant argues that he received ineffective assistance of counsel by his trial attorney's failure to move for a mistrial "regarding the 'red herring' incident and settling for a 'curative' instruction." We disagree.

A mistrial may be declared "when an impartial verdict cannot be obtained, or when a guilty verdict could be returned but would be reversed on appeal because of an obvious procedural error occurring during the trial." *People v Hicks*, 447 Mich 819, 830; 528 NW2d 136 (1994). "Any doubts concerning the existence of manifest necessity should be resolved in favor of the defendant." *Id*., citing *Downum v United States*, 372 US 734, 738; 83 S Ct 1033; 10 L Ed 2d 100 (1963).

Here, there were no adequate grounds upon which defendant's trial attorney could have moved for a mistrial. The prosecutor's use of the term "red herring"—at worst—warranted a limiting instruction, and the trial court instructed the jury that the PowerPoint presentation that the prosecutor used during her closing argument was not evidence. At best, the "red herring" comments accurately summarized defendant's trial attorney's attempt to draw the jury's focus away from the substantive evidence and confuse the jury by mischaracterizing the evidence. Therefore, any motion for a mistrial would have lacked merit, and defendant's trial attorney's failure to move for a mistrial in response to the prosecutor's use of the term "red herring" did not amount to ineffective assistance of counsel. *Gist*, 188 Mich App at 613. And, in any event, defendant cannot establish "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different," *Toma*, 462 Mich at 302-303, because the jury presumably followed the trial court's limiting instruction, *Graves*, 458 Mich at 486.

## B. FAILURE TO CALL CHARACTER WITNESSES

Next, defendant asserts that he received ineffective assistance of counsel by his trial attorney's failure to call character witnesses. We disagree.

According to defendant, "he had defense witnesses that he wanted called to testify at trial," and considering "the state of affairs of this case, even one character witness could have been invaluable and turned the tide of the guilty verdicts." In support of this claim, defendant relies on a purported affidavit in which he avers that "he had defense witnesses that he wanted called to testify at trial." However, this affidavit is not in the record, and our review is limited to errors apparent on the record. *Matuszak*, 263 Mich App at 48.

Moreover, "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Defendant has failed to overcome the strong presumption that his trial attorney's decision not to present any witnesses at trial was a matter of trial strategy, *Toma*, 462 Mich at 302, because there is nothing in the record containing facts that would otherwise support a different conclusion. Moreover, defendant cannot establish prejudice because he fails to demonstrate "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Toma*, 462 Mich at 302-303.

## C. FAILURE TO IMPEACH WITNESSES

Defendant also claims that his trial attorney was ineffective for failing to impeach the victims with CPS and police reports. We disagree.

Because the record is devoid of any CPS reports or police reports, it cannot be ascertained with any level of certainty precisely what facts defendant claims that his trial attorney should have used to impeach the victims. Defendant has thus failed to "overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances." *Toma*, 462 Mich at 302. Moreover, defendant cannot establish prejudice because he fails to demonstrate "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Id*. at 302-303. In support of this claim, defendant reiterates the instances in which the victims testified that they could not recall certain events. Even assuming that the purported CPS and police reports would have served a valid impeachment purpose, the victims had testified throughout the course of trial that they could not recall certain events when asked. In other words, the jury was already given the opportunity to evaluate the victims' recollection of events in assessing their credibility. To conclude that any unknown information contained in the purported CPS and police reports would have affected the outcome of trial would be nothing more than conjecture and speculation.

## V. SENTENCING ERROR

Finally, defendant contends that the trial court abused its discretion when it sentenced him to serve 40 to 60 years in prison for his CSC-I convictions. We disagree.

Courts are not bound by the legislative sentencing guidelines, as they are only advisory. *People v Lockridge*, 498 Mich 358, 399; 870 NW2d 502 (2015). Accordingly, while the sentencing court must score and consider the guidelines, it is not compelled to impose a minimum sentence within the calculated range, and it may depart from the sentencing guidelines range without stating substantial and compelling reasons to justify the departure. *Id*. at 364-365. This Court reviews a trial court's decision to depart from the applicable sentencing guidelines range for reasonableness. *Id*. at 365. In *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017) (*Steanhouse II*), the Michigan Supreme Court further explained:

> [T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the "principle of proportionality" set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender."

A sentencing departure occurs when, as in this case, a court imposes a sentence that exceeds "both the applicable guidelines minimum sentence range and the . . . mandatory minimum." *People v Wilcox*, 486 Mich 60, 73; 781 NW2d 784 (2010). The trial court abuses its discretion when it imposes a sentence that is unreasonable because it violates the principle of proportionality. *People v Dixon-Bey*, 321 Mich App 490, 523-524; 909 NW2d 458 (2017). "Under the principle of proportionality standard, a sentence must be 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse (On Remand)*, 322 Mich App 233, 238; 911 NW2d 253 (2017) (*Steanhouse III*), quoting *Milbourn*, 435 Mich at 636. "Accordingly, the sentencing court must impose a sentence that takes 'into account the nature of the offense and the background of the offender.' " *Steanhouse III*, 322 Mich App at 238, quoting *Milbourn*, 435 Mich at 651. The sentencing court may impose a departure sentence when "the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Milbourn*, 435 Mich at 657.

> Relevant factors under the proportionality standard include, without limitation:
>
> "(1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation." [*Steanhouse III*, 322 Mich App at 238-239, quoting *People v Lawhorn*, 320 Mich App 194, 207; 907 NW2d 832 (2017).]

Moreover, "[a]n appellate court must evaluate whether reasons exist to depart from the sentencing guidelines and whether the *extent* of the departure can satisfy the principle of proportionality." *Steanhouse III*, 322 Mich App at 239. "[E]ven in cases in which reasons exist to justify a departure sentence, the trial court's articulation of the reasons for imposing a departure sentence must explain how the extent of the departure is proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 239.

"The first inquiry in our reasonableness review is whether there were 'circumstances that are not adequately embodied within the variables used to score the guidelines.' " *Id*., quoting *Milbourn*, 435 Mich at 659-660.

> To conduct such an analysis, we must compare the stated reasons for exceeding the guidelines with the scored offense variables (OVs) to determine whether those reasons were already encompassed within the guidelines. Specifically, we must determine whether the trial court abused its discretion by imposing a departure sentence without articulating whether the guidelines adequately took into account the conduct alleged to support the particular departure imposed. [*Steanhouse III*, 322 Mich App at 239-240 (citation omitted).]

"In evaluating whether the departure sentence imposed for defendant is proportional in accordance with *Milbourn*," an additional factor to analyze is the prior relationship between the defendant and the victim. *Id*. at 242. "[A] prior relationship between the offender and the victim can be either a 'very mitigating circumstance or a very aggravating circumstance, depending upon the history of interaction between the parties.' " *Id*., quoting *Milbourn*, 435 Mich at 660-661.

In this case, the initial sentencing information report (SIR) scored the prior record variables (PRVs) and offense variables (OVs) for defendant's CSC-I convictions, as a second habitual offense. The total scores placed defendant in PRV level E and OV level VI, which resulted in a guidelines minimum sentence range of 225 to 468 months (18 years and nine months to 39 years) or life. However, one of defendant's CSC-I convictions was subject to a mandatory minimum sentence of 25 years under MCL 750.520b(2)(b). In the presentence investigation report (PSIR), the MDOC recommended a sentence of 40 to 60 years, which was slightly above the high end of the guidelines minimum range as calculated in the SIR.

At defendant's sentencing, the scores for OV 9 (number of victims) and OV 11 (criminal sexual penetration) were reduced to zero, which lowered the OV level to IV, and in turn, lowered the guidelines minimum sentence range to 135 to 281 months (11 years and three months to 23 years and five months). The trial court expressed that the guidelines range was accurate, but that it did not "take into account the number of years that this was going on . . . [or] the number of victims." Further, the trial court reasoned:

> It's—one of the things, when you sit through a trial and you listen to the testimony of the victims and you really have a sense as the sentencing judge, what the victims went through and will continue to go through, I don't disagree with Ms. Morton's statement said by somebody else that, in reality, once a crime like this occurs, the person that existed before that ceases to exist. It doesn't mean that – and I hope for the victims that you can go on and live, live a good life. I hope this puts it behind you. And just because it will be a different kind of life, I—I hope you can find happiness. And I—I think that you will, hopefully, now that his part is done. And you will know that, given the defendant's age, the likelihood of him getting out is slim. And if he does get out, he would be old enough that, hopefully, any fears that you have will be dissipate[d] knowing how long he'll be put away. So, I do have that hope for you.

Ultimately, the trial court found that the recommendation from the MDOC was "appropriate" and sentenced defendant to serve 40 to 60 years in prison for his CSC-I convictions.

We agree that circumstances exist in this case that justify the imposition of a departure sentence. The horrific and heinous nature of defendant's crimes, their effect on the victims, and the relationship between the victims and defendant justify a departure from the guidelines minimum sentence range and the statutory minimum sentence. See *Steanhouse III*, 322 Mich App at 239-240, 242. Further, it appears likely that the two factors identified by the trial court—the lengthy period of time over which the abuse occurred and the fact that four victims were involved—were " 'not adequately embodied within the variables used to score the guidelines.' " *Steanhouse III*, 322 Mich App at 239, quoting *Milbourn*, 435 Mich at 659-660.

Accordingly, we are satisfied that the trial court's departure was justified in this case.

Affirmed.

/s/ Brock A. Swartzle
/s/ David H. Sawyer
/s/ Amy Ronayne Krause

-13-